FARRELL v. NUTTER.

1. PARENT AND CHILD—CONVEYANCE STRIPPING PARENT OF PROPERTY —PRESUMPTIONS—BURDEN OF PROOF.

Transactions whereby elderly parents strip themselves of most of their property by conveyances thereof to children are critically scrutinized by the courts, the burden of proof being cast upon those seeking to sustain their validity.

2. SAME—CARE AND KEEP—PROPERTY—BURDEN OF PROOF.

Transfers of all parents' property, except life estate, to son and his wife in return for promise to care and provide for the transferors as well as for past services, to be sustained, must be shown not to be to the parents' disadvantage, that they were fair and of the parents' own free will and that no advantage was taken of them by reason of age, mental condition, or confidence in the transferees and that the latter have fulfilled the terms of their agreement, in letter and spirit, so far as permitted by the parents, and are ready and willing to continue so to do.

REFERENCES FOR POINTS IN HEADNOTES
[1, 2]  39 Am Jur, Parent and Child §§ 97, 99.
[3]  19 Am Jur, Equity § 123.

3. Equity—Relief.

A court of equity molds its relief according to the character of
the case.

4. Appeal and Error—Equity—Care and Keep—Jurisdiction.

Decree in suit by son and wife against father, now · declared
mentally incompetent, and others to restrain withdrawal of
assets, wherein accounting was required of both plaintiffs and
defendant guardian and lien imposed upon realty of son, is
not disturbed under record presented, jurisdiction having been
retained to insure proper care for the father.

Appeal from Oakland; Adams (Clark J.), J. Sub-
mitted January 3, 1961. (Docket No. 15, Calendar
No. 48,639.) Decided March 1, 1961.

Bill by Roy M. Farrell against Elmer Farrell and
another to restrain withdrawal of funds from bank.
Myrtle L. Farrell added as party plaintiff and pro-
ceedings continued by and in the name of substituted
party defendant, Bartlette . E. Nutter, guardian of
Elmer Farrell, mentally incompetent. Cross bill to
set aside deeds and power of attorney previously
given plaintiffs, and for accounting. Decree for
plaintiffs sustaining certain property transactions,
impressing trust in respect to one asset, providing
for accounting by guardian, and directing fulfillment
by plaintiffs of agreement to provide maintenance,
medical care, and burial for aged parent, with juris-
diction retained to insure future performance. De-
fendant appeals. Affirmed and remanded . for fur-
ther proceedings as required.

*Sauer & Girard* and *Harry E. Warning,* for plain-
tiffs.

*Bartlette E. Nutter,* guardian, defendant.

Souris, J. On September 27, 1956, Elmer and
May Farrell were both past 80 years of age. May

Farrell, in fact, was about 83, nearly blind and partially paralyzed. On this date she and her husband entered into an arrangement with their only son, Roy, and his wife, Myrtle. The parents conveyed to Roy and Myrtle their farms, reserving life estates, and conveyed, also, title to land held subject to a land contract. In addition, they executed a power of attorney, giving Roy ample powers to "manage our affairs, including the power to exercise the general control and supervision over all our lands, tenements and hereditaments, pay taxes, effect insurance, sign, execute and deliver leases and for money and in our names, to grant, bargain and sell any part or parcel of all lands or interest in lands that we hold in the township of White Lake, Oakland county, Michigan, for such price and/or such terms as to him shall seem meet, and for us, and in our names to make, execute, acknowledge and deliver good and sufficient deeds and conveyances for the same, either with or without covenants and warranty, releasing any right, title or interest that we may have in the same, including life estate, and to execute any and all deeds in pursuance to land contracts that we have heretofore entered into."

Simultaneously therewith the parties executed an instrument entitled, "Agreement to Care and Provide For", the opening clauses of which describe the family situation at that time, it reciting, in part, the parents' "infirmities of age" and recognizing "the past work and services and loving attention of Roy M. Farrell and Myrtle L. Farrell, his wife, in the interests and welfare of the father and mother." It was agreed that Roy and Myrtle should care and provide for the parents during their lives, and give them proper burial. This agreement closed with an additional acknowledgment of the "care and attention heretofore rendered by their son and his wife, * * * declaring that the consideration for this

agreement is not alone the property transferred, but the love and affection existing between the parties."

Following the execution of these instruments, family affairs went on much as before, until the death of the senior Mrs. Farrell in July of 1958. Subsequent thereto the condition of Elmer Farrell, the father, steadily grew worse. (He is now adjudged incompetent.) A Mr. Parnell, also an elderly man, was first brought in by Roy to care for his father. He was told to get whatever Mr. Farrell wanted and send the bill to the son, Roy. The services, however, did not continue for long. Mr. Farrell's appetite did not respond to Mr. Parnell's cooking.

During this time Mr. Farrell's health was failing. He had trouble controlling his bladder, but he would not permit Mr. Parnell to launder his underclothing. His son came often each week and would sometimes take his father out. The old gentleman's faculties were obviously failing. He would turn on the television and watch it, yet, it was said, seem not to be aware of whether it was on or off. On one occasion Mr. Parnell and Mr. Farrell went over to the new house Roy was building. Mr. Parnell worked on the house and "Elmer set there in a chair." The next day Mr. Farrell refused to return, stating that he was not going over there and work all day, as he had done the day before.

After Mr. Parnell left, Mr. Farrell's physical and mental condition did not improve. He was ill-kempt, feeble, and childish in his actions and reactions. He relied more and more upon the sympathy and ministrations of 2 neighbors, one of them, Mrs. Marble, a niece of the deceased Mrs. Farrell. It is just at this point that serious trouble arose between father and son, culminating in a series of legal actions. On March 7, 1959, Mr. Farrell first signed a revocation of the power of attorney formerly given his son and signed a new one in favor of Mrs. Marble. Two days

later the son filed in the Oakland county probate court a petition for guardianship of his father as a mental incompetent, and asked that he be appointed guardian. The next day he filed the present action, setting forth the above and praying an injunction (which was issued) restraining any withdrawing of funds. The father then, through counsel, answered the petition in the probate court, charging his son with failure to care and provide for him and charging conversion of his funds. He also filed a cross bill in the present action, praying for an accounting and asserting conversion and other wrongful acts by his son. On March 30th the probate court appointed Mr. Bartlette E. Nutter, attorney-at-law and the defendant and cross plaintiff herein, as guardian. By leave of court the guardian was substituted in place of the father and Myrtle Farrell, wife of Roy, was added as a party plaintiff and as cross defendant. The matter came to trial in the Oakland circuit on January 5, 1960. The father, through guardian and attorney, charged the son with abuse of the power of attorney, conversion of moneys, failure to pay the mother's funeral and burial expenses, failure to account, and failure to care properly for the father. The son, and his wife, on the other hand, assert that the charges made are without foundation in fact and have arisen out of the malice of antagonistic and meddlesome neighbors. The trial chancellor held generally for the plaintiffs. The original transfers (of September 27, 1956, hereinabove set forth) were not found unconscionable, as charged, nor was there a finding of a conversion. Plaintiffs were, however, required by the chancellor to reimburse defendant for the mother's burial expenses shown to have been paid by the father. An accounting was ordered and jurisdiction retained for the purpose of insuring full compliance with the care and provision agreement.

The general principles controlling a case of this kind were correctly stated by the trial chancellor and may be found in *Williams* v. *Williams*, 198 Mich 1, 4, 5, quoted with approval in *Spencer* v. *Hill*, 336 Mich 22, 25, 26:

"That the presumptions are against transactions of this nature and they are critically scrutinized by the courts, putting the burden of proof upon those seeking to sustain them, requires no citation of authority. In view of plaintiff's age, their kinship, and the confidential relations shown to exist between them at the time, it was incumbent upon defendants to show that the agreement with their father was not to his disadvantage, was fair to him and of his own free will, that no advantage was taken by them of his age, mental condition, or confidence in them, that they have fulfilled the terms of their agreement, in letter and spirit, so far as permitted by him, and are ready and willing to continue so to do."

The application of the principles stated to the case at bar presents, as always, some difficulties. Much of the evidence relating to why certain actions were taken, and the dispositions of the funds therefrom, were equally within the knowledge of the now incompetent father, and testimony thereon was not taken.* But an even greater difficulty arose from the hostile attitudes of various of the witnesses. Their positions are irreconcilable. If an action of the son, Roy, is capable of a construction indicating lack of solicitude for parental welfare, or dishonest motive or design, such construction is invariably put upon it by 1 of the 2 antagonistic groups, and, of course, denied expressly or impliedly by the other. The parties cannot agree even upon whether Roy has helped his father with the farms for the past 50 years. The plaintiffs say that Roy devoted his entire life (except for 3 years, when he was in town) to working

---

* See CL 1948, § 617.65 (Stat Ann § 27.914).

for and with his father and mother. Defendant says this is not true, that Roy "never worked with his father" and that there is nothing to show any continuing service by the son for his parents. Similarly, the plaintiffs say that after May Farrell's death, the son and daughter planned to take the father to live with them and were building a new home on their property for that purpose. Defendant replies it was merely a new home for son and wife and was not being built for the father as well, since he "could be well cared for and provided for in his existing residence."

The same conflicts exist with respect to the actions of the neighbors. They picture themselves as acting from the highest of motives, and there is no doubt that their ministrations, whatever their motives, were helpful to one obviously long past the point of helping himself. The son, on the other hand, asserts with much vigor, and with considerable justification, that any complaints as to his father's situation known to the neighbors should first have been communicated to him, "and thoroughly discussed with him before institution of litigation." An indication of the intensity of the feeling on the part of at least 1 of the neighbor ladies against Roy may be judged from her gratuitous comment, in her direct examination (when asked if she had attended the elder Mrs. Farrell's funeral), "I did but his son did not. Neither Roy nor Myrtle came to the funeral." Much later, upon her cross-examination, the following appears:

"*Q.* You said something about Roy and Myrtle not going to his mother's funeral.

"*A.* That is correct.

"*Q.* Did you know that at the time of the funeral that Myrtle had seriously hurt herself and was bedridden under the constant attendance of Roy, did you know that?

"*A*. No, sir. He was at his father's house the morning of the funeral.

"*Q*. But you did not know of his wife's physical—

"*A*. I know she fell but I did not know she had a doctor at the house at that time. They said she didn't.

"*Q*. You know everything else about this family but you didn't know that, did you?

"*A*. I know she was sick."

The entire record, which we have examined in detail, furnishes ample support for the conclusion of the trial chancellor with respect to the activities of the neighbor ladies contained in the following excerpt from his opinion:

"The court is impressed with the fact that Roy and Myrtle commenced the construction of a new home about November 15, 1959, its primary and sole purpose being to house Mr. Elmer Farrell near their home on section 2, White Lake township, indicative of the fact that Roy and Myrtle were sincerely interested in carrying out their commitments but Elmer, because of his health and because of his sturdy character and independence of thinking apparently didn't go along with this thought in its entirety. Be that as it may he became in worse and worse health. People who came in to stay with him did not have much success except that a neice, Mrs. Marble, and a neighboring friend, Mrs. Rush, began to influence him through attention, undoubtedly sympathy, and as a consequence Elmer began to follow their thinking and instructions, recommendations as contrasted with the instructions, attempted interest and help of Roy and Myrtle who had cared for this man for the many years while he was normal and in full control of his faculties.

"Now, this court must keep in mind, too, that as the spring months passed it was evident that Elmer was not mentally strong and as he pulled further from his son and daughter-in-law, he became more and more under the influence of Mrs. Marble and

Mrs. Rush. Also, it became evident that he was less and less able to care for himself or think for himself but of course before the month of March was passed the court of competent jurisdiction had decided that he was not mentally competent. Undoubtedly his mental incompetence resulted from his age and from his health and that mental incompetence can in large part explain the weakening of his relationship with his only son and the strength of his relationship with a couple of neighboring women who had little or no right to interfere with this family. Of course the whole relationship literally blew asunder in March when first of all Roy, seeing the influence of these women upon his father, decided to prevent his father from handling his own property any longer so he removed the physical indications of property such as bonds and bankbooks and so forth from his father's reach and on March 10th he petitioned on the ground his father was incompetent. At the same time he filed a suit to restrain Mrs. Marble from dissipating his father's assets and of course the father, through a guardian, subsequently appointed on March 30th, countered by filing the cross bill of complaint with which we are here concerned and in which he here seeks to set aside the transaction."

Our previous comments as to irreconcilability are equally pertinent to the financial and property transactions of Roy under his power of attorney. Each transaction susceptible of 2 interpretations, one fair and reasonable, the other covetous or avaricious, is given both. It would add nothing to the jurisprudence of this State to describe in detail the pros and cons as to the alleged conversion by Roy of $11,000 of his father's money, or his alleged failure to account for his father's life interests in certain property conveyed or contracted to be sold, or the charges made in respect of other transactions. There is no doubt that Roy did not handle or record these matters with the skill and particularity that may prop-

erly be expected of a professional agent or trustee, or, indeed, of a reasonably experienced business man, and it is urged to us, as it was to the trial chancellor, that he should be displaced in his stewardship and the conveyances rescinded. The essence of the charges made against him is that he was lacking in honesty and integrity and that he was callous to his father's needs. These issues are essentially factual. But Roy, it will be recalled, was not a professional agent. He was a man over 50 years of age who had left school in the eighth grade and who had farmed all his life. Irregularities in accounting and handling the properties there may have been, but the trial chancellor, having seen and observed the parties, made his determinations, and we find therein not one word of criticism of Roy's *bona fides*.. In addition, the chancellor finds that setting aside the transactions, as prayed, "would be doing an inequity to Roy and Myrtle which shouldn't be done," and, moreover, that "in no respect did Roy and Myrtle attempt to take advantage of their parents," affirmatively finding, as well, that the son and his wife "were willing to continue on to support them [the parents] for so long as their father would permit it." We are not, upon our review of the entire record, persuaded that the chancellor's determinations were in error. Equity molds its relief according to the character of the case. *Seifert* v. *Keating*, 344 Mich 456. The chancellor retained jurisdiction of the case to insure proper care for the father, decreed an equitable lien in the father's favor for the $11,000 of his separate estate invested in the home now under the Buell contract,* ordered that the financial affairs be

---

* As to this item the chancellor held as follows:

"Now, that $11,000 was taken from Elmer's estate, and the court concedes, with his consent and approval and invested in the home which has now become the Buell contract insofar as the Farrells are concerned, but peculiarly and unfortunately in the court's opinion that contract is in the name of Roy and Myrtle only. Now very obviously

brought in order by an accounting, as well as granting ancillary relief, but refused to cancel or set aside the deeds given him, or, in substance, to displace his authority. The situation, as in so many of the cases involving the care of the aged, is a difficult and delicate one and, in our opinion, will find its solution under the terms of the decree provided all parties try to live within it.

We find no error. Decree affirmed. Remanded to the circuit court in chancery for further proceedings as required. Costs to appellees.

DETHMERS, C. J., and CARR, KELLY, SMITH, BLACK, EDWARDS, and KAVANAGH, JJ., concurred.

---

Elmer has $11,000 of his separate estate invested in that estate and he should have credit for it. Eleven Thousand Dollars does not come within the purview or intent of the agreement of September 27, 1956, and certainly cannot be construed as a gift. The decree then will, among these other things that the court will indicate, provide that Elmer, through his guardian, shall have an equitable mortgage upon the property described in the Buell contract in the amount of $11,000, bearing interest at 6% from September 29, 1958. That money is Elmer's alone and the decree should so provide."